**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**Peter Kelly,**

                              **Plaintiff,**

        **-against-**

**Communications Workers of America, AFL-CIO and Verizon New York Inc.,**

                              **Defendants.**

---

**1:22-cv-10923 (JGLC) (SDA)**

**REPORT AND RECOMMENDATION**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE JESSICA G.L. CLARKE, UNITED STATES DISTRICT JUDGE:**

Pending before the Court are a motion by plaintiff Peter Kelly ("Plaintiff" or "Kelly"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment in his favor (Pl.'s 2/16/25 Not. of Mot., ECF No. 84), and motions by defendants Communications Workers of America, AFL-CIO ("CWA" or the "Union") and Verizon New York Inc. ("Verizon") (together, "Defendants"), pursuant to Rule 56, for summary judgment in their favor. (CWA 2/18/25 Not. of Mot., ECF No. 95; Verizon 2/18/25 Not. of Mot., ECF No. 89.) For the reasons set forth below, it is respectfully recommended that Plaintiff's motion be DENIED, the Union's motion be GRANTED and Verizon's motion be GRANTED IN PART and DENIED IN PART.

**BACKGROUND FACTS**[1]

Kelly is a Caucasian male. (Pl.'s 56.1 ¶ 1; Verizon Resp. Pl.'s 56.1 ¶ 1; CWA Resp. Pl.'s 56.1 ¶ 1.) Verizon employed Kelly as a Field Technician from February 21, 2000 until Verizon

---

[1] The Background Facts section is drawn from the parties' Rule 56.1 Statements (*see* Pl.'s 56.1, ECF No. 87; Verizon 56.1, ECF No. 94; CWA 56.1, ECF No. 97; Pl.'s Resp. CWA 56.1, ECF No. 117; Pl.'s Resp. Verizon

terminated him on May 19, 2021. (Pl.'s 56.1 ¶¶ 2, 7; Verizon Resp. Pl.'s 56.1 ¶¶ 2, 7; CWA Resp. Pl.'s 56.1 ¶¶ 2, 7; Verizon 56.1 ¶ 19; Pl.'s Resp. Verizon 56.1 ¶ 19.) Among other things, Field Technicians conduct home visits to assist customers with installations of Verizon products and troubleshooting network and other service issues. (Verizon 56.1 ¶ 4; Pl.'s Resp. Verizon 56.1 ¶ 4.) Field Technicians operate out of a certain assigned garage from which they are dispatched and travel in a Verizon-owned vehicle to customer locations to perform assigned tasks. (Verizon 56.1 ¶ 5; Pl.'s Resp. Verizon 56.1 ¶ 5.) At all relevant times, Kelly was assigned by Verizon to the garage located at 999 Nepperhan Avenue, Yonkers, New York. (Pl.'s 56.1 ¶ 3; Verizon Resp. Pl.'s 56.1 ¶ 3; CWA Resp. Pl.'s 56.1 ¶ 3; Verizon 56.1 ¶ 21; Pl.'s Resp. Verizon 56.1 ¶ 21.)

Kelly was a member of the Union throughout his employment and at the time of his termination. (Pl.'s 56.1 ¶ 8; Verizon Resp. Pl.'s 56.1 ¶ 8; Verizon 56.1 ¶ 20; Pl.'s Resp. Verizon 56.1 ¶ 20.) The Union is a labor organization that represents employees employed by Verizon in the Plant Bargaining Unit, which includes Field Technicians. (CWA 56.1 ¶ 1; Pl.'s Resp. CWA 56.1 ¶ 1; Dempsey Decl., ECF No. 99, ¶ 2.) Verizon and the Union are parties to a collective bargaining agreement (the "CBA") that covers the employees in Verizon's Plant Bargaining Unit. (CWA 56.1 ¶ 2; Pl.'s Resp. CWA 56.1 ¶ 2.) The CBA provides that Kelly could be terminated from his employment only for cause and included a grievance and arbitration procedure. (Pl.'s 56.1 ¶¶ 10-11; CWA Resp. Pl.'s 56.1 ¶¶ 10-11; Verizon Resp. Pl.'s 56.1 ¶¶ 10-11; CBA, ECF No. 99-1, Arts. 10, 11 & 12.)

---

56.1, ECF No. 118; Verizon Resp. Pl.'s 56.1, ECF No. 123; CWA Resp. Pl.'s 56.1, ECF No. 126; Verizon 56.1 Reply, ECF No. 134), as well as the documents filed by the parties in connection with the pending motions.

On April 6, 2021, at 12:26 p.m., Kelly inadvertently answered a call on his company-owned cellphone[2] from Amy Williamson ("Williamson"), a Verizon employee, who contacted Kelly to inquire about his expected arrival time at a customer's home. (Verizon 56.1 ¶¶ 64, 66; Pl.'s Resp. Verizon 56.1 ¶¶ 64, 66.) The call from Williamson to Kelly was recorded through Williamson's computer. (Verizon 56.1 ¶ 65; Pl.'s Resp. Verizon 56.1 ¶ 65.) While Williamson was on the line on Kelly's company cellphone, Kelly was speaking on his personal cell phone to his ex-girlfriend, Megan Hansler ("Hansler") and Williamson overheard Kelly stating the following to Hansler, as recorded by Verizon: "It's so weird because like, you don't call back, but then you'll text me, why don't you text me back? Stop being a fucking [n-word], bro." (*See* CWA 56.1 ¶ 10; Pl.'s Resp. CWA 56.1 ¶ 10; 4/6/21 Call Recording, Rocco Decl. Ex. I, ECF No. 92-9.) Verizon contends that Kelly used the full n-word, and Kelly contends that he used the word "nigga." (Verizon 56.1 ¶ 68; Pl.'s Resp. Verizon 56.1 ¶ 68.[3])

Williamson was "very upset" with Kelly's use of the "full n-word" and immediately reported the incident to Frank Schatzer, her Local Manager. (*See* Verizon 56.1 ¶ 74; Pl.'s Resp. Verizon 56.1 ¶ 74.) Verizon assigned Yvonne Rocco ("Rocco") to investigate Williamson's complaint regarding Kelly. (Verizon 56.1 ¶¶ 79-80; Pl.'s Resp. Verizon 56.1 ¶¶ 79-80.) During Rocco's interview of Kelly, Kelly admitted using the word "nigga."[4] (*See* Verizon 56.1 ¶¶ 81-83;

---

[2] Field Technicians are issued a company-owned cell phone to use to communicate with other Verizon employees while out in the field. (Verizon 56.1 ¶ 6; Pl.'s Resp. Verizon 56.1 ¶ 6.)

[3] Exhibit I to the Rocco Declaration, which is a recording of the subject telephone call between Williamson and Kelly (Rocco Decl., ECF No. 92, ¶ 29), was provided to the Court in native format and the Court has listened to the recording. The Court is unable to discern whether Kelly used the full n-word, or whether he used the word "nigga."

[4] Again, there is a dispute regarding whether Kelly used the full n-word, or the word "nigga."

Pl.'s Resp. Verizon 56.1 ¶¶ 81-83.) Rocco concluded that Kelly violated the provisions of Verizon's Code of Conduct 2.0 relating to Discrimination and Harassment, and maintaining a respectful, safe and professional workplace. (Verizon 56.1 ¶ 84; Pl.'s Resp. Verizon 56.1 ¶ 84.)

Section 1 of the Verizon Code of Conduct is entitled "A respectful, safe and professional workplace" and provides in part, as follows:

> We are committed to a safe, healthy, and professional work environment in which each of us is treated with respect and given the opportunity to achieve performance excellence.
>
> **A respectful and inclusive workplace**
>
> As a Verizon employee, you are expected to treat customers, fellow employees, and vendors with respect, dignity, honesty, fairness, and integrity at all times. Not only is this sound business practice, it's also the right thing to do.
>
> **Commitment to diversity**
>
> An inclusive workplace is key to our success and we will win in the marketplace by attracting, retaining, and developing a highly qualified, dedicated, and diverse workforce.
>
> Our commitment to inclusiveness extends beyond our workplace. Verizon seeks to do business with diverse suppliers and vendors. And we refuse to use facilities, sponsor events, or maintain memberships at organizations that have exclusionary membership practices.
>
> **Discrimination and harassment**
>
> We are committed to maintaining a workplace free from illegal discrimination or harassment, including sexual harassment or harassment based on any other legally protected category.
>
> We respect and comply with all laws providing equal opportunity to individuals without regard to race, color, religion, age, gender, pregnancy, sexual orientation, gender identity and expression, national origin, disability, marital status, citizenship status, veteran status, military service status, and any other protected category under applicable law.
>
> Unlawful harassment comes in many forms and includes conduct or language that creates a hostile or offensive work environment. It can be physical, verbal, or visual. For example, sexual harassment may include inappropriate touching, unwelcome romantic advances, lewd gestures, or the display of obscene material.

4

Other forms of harassment may include racist comments, ethnic slurs, religious stereotypes, or homophobic jokes.

We do not tolerate such behavior. If you are subjected to or observe unlawful harassment, you should report it to your supervisor (if appropriate), Human Resources, the Ethics Office, or the Legal Department. and, if you are comfortable doing so, confront the perceived harasser and ask him or her to stop. Supervisors who become aware of harassment concerns must report the issue.

(Verizon Code of Conduct 2.0, ECF No. 86-9, at PDF pp. 9-11 (emphasis in original).) In the "Introduction" section of the Code of Conduct, employees are warned that "[v]iolations of this Code, or any other Verizon policy, can lead to discipline up to and including termination of employment." (*Id*. at PDF p. 7.)

Rocco shared her findings with Verizon's labor relations department. (Verizon 56.1 ¶ 86; Pl.'s Resp. Verizon 56.1 ¶ 86.) Thereafter, a decision was made to terminate Kelly's employment. (Verizon 56.1 ¶¶ 87-88; Pl.'s Resp. Verizon 56.1 ¶¶ 87-88.) Verizon suspended Kelly on May 10, 2021 for ten days pending dismissal. (Verizon 56.1 ¶ 90; Pl.'s Resp. Verizon 56.1 ¶ 90.) The same day, in accordance with the CBA, Verizon notified Local 1103 of its decision to commence termination procedures against Kelly.[5] (Verizon 56.1 ¶ 92; Pl.'s Resp. Verizon 56.1 ¶ 92; 5/10/21 Notice Letter, Griffith Decl. Ex. E, ECF No. 91-5.) At the conclusion of the ten-day suspension, Verizon terminated Kelly's employment, effective May 19, 2021. (Verizon 56.1 ¶ 91; Pl.'s Resp. Verizon 56.1 ¶ 91.)

Local 1103 requested a second step grievance hearing on behalf of Kelly concerning Kelly's termination, which was held on June 9, 2021. (2nd Step Grievance, Chapoteau Decl. Ex. G, ECF No. 90-7; Verizon 56.1 ¶ 95; Pl.'s Resp. Verizon 56.1 ¶ 95.) On June 24, 2021, Verizon denied

---

[5] CWA is a national labor union, while Local 1103 is the local union affiliated with CWA. (*See* CWA Opp. Mem., ECF No. 125, at 12.)

Kelly's grievance. (Verizon 56.1 ¶ 96; Pl.'s Resp. Verizon 56.1 ¶ 96.) On July 8, 2021, the Union decided to pursue Kelly's grievance through the third step provided under the CBA's grievance procedure. (Verizon 56.1 ¶ 97; Pl.'s Resp. Verizon 56.1 ¶ 97.) CWA assumed responsibility for the grievance filed on Kelly's behalf by Local 1103 at the third step of the grievance procedure. (CWA 56.1 ¶ 19 Pl.'s Resp. CWA 56.1 ¶ 19.)

On July 22, 2021, Verizon and the Union conducted a third step grievance hearing. (Verizon 56.1 ¶ 98; Pl.'s Resp. Verizon 56.1 ¶ 98; CWA 56.1 ¶ 19; Pl.'s Resp. CWA 56.1 ¶ 19.) On September 9, 2021, Verizon denied the grievance. (Verizon 56.1 ¶ 99; Pl.'s Resp. Verizon 56.1 ¶ 99.) On September 10, 2021, the Union determined it would take no further action and would not arbitrate Kelly's grievance. (Verizon 56.1 ¶ 100; Pl.'s Resp. Verizon 56.1 ¶ 100; CWA 56.1 ¶ 22; Pl.'s Resp. CWA 56.1 ¶ 22.)

On September 17, 2021, Kelly appealed the Union's decision to not pursue his grievance to arbitration to William Gallagher ("Gallagher"), Union Area Director. (Verizon 56.1 ¶ 101; Pl.'s Resp. Verizon 56.1 ¶ 101; CWA 56.1 ¶ 24; Pl.'s Resp. CWA 56.1 ¶ 24.) On October 18, 2021, Gallagher, on behalf of the Union, denied Kelly's appeal because "[t]he Union would not be able to convince an Arbitrator that [Kelly] did not violate the Verizon Codes of Conduct." (10/18/21 Denial Letter, Gallagher Decl. Ex. D, ECF No. 100-4, at PDF p. 1; *see also* Verizon 56.1 ¶ 103; Pl.'s Resp. Verizon 56.1 ¶ 103; CWA 56.1 ¶ 27; Pl.'s Resp. CWA 56.1 ¶ 27.) Gallagher also advised Kelly that he could appeal to CWA District 1 Vice President Dennis Trainor ("Trainor"). (10/28/21 Denial Letter at PDF p. 2; *see also* Verizon 56.1 ¶ 103; Pl.'s Resp. Verizon 56.1 ¶ 103; CWA 56.1 ¶ 27; Pl.'s Resp. CWA 56.1 ¶ 27.)

On October 27, 2021, Kelly appealed Gallagher's denial of his initial appeal to Trainor. (10/27/21 Appeal, Chapoteau Decl. Ex. M, ECF No. 90-13; CWA 56.1 ¶¶ 20, 28; Pl.'s Resp. CWA 56.1 ¶¶ 20, 28.) From June 2021 through April 2022, Trainor kept in contact with Kelly through text messaging, among other methods, and kept him informed of the status of his appeal. (CWA 56.1 ¶ 20; Pl.'s Resp. CWA 56.1 ¶ 20.) On April 7, 2022, Trainor, on behalf of the Union, denied Kelly's second appeal. (4/7/22 Denial Letter, Chapoteau Decl. Ex. N, ECF No. 90-14; Verizon 56.1 ¶ 105; Pl.'s Resp. Verizon 56.1 ¶ 105; CWA 56.1 ¶ 32; Pl.'s Resp. CWA 56.1 ¶ 32.)

On or about May 2, 2022, Kelly appealed Trainor's denial of his second appeal to Christopher Shelton ("Shelton"), Union President. (Kelly Letter to Shelton, Chapoteau Decl. Ex. Q, ECF No. 90-17; Verizon 56.1 ¶ 111; Pl.'s Resp. Verizon 56.1 ¶ 111; CWA 56.1 ¶ 34; Pl.'s Resp. CWA 56.1 ¶ 34.) On June 1, 2022, Shelton, on behalf of the Union, denied Kelly's third appeal. (6/1/22 Denial Letter, Chapoteau Decl. Ex. S, ECF No. 90-19; Verizon 56.1 ¶ 113; Pl.'s Resp. Verizon 56.1 ¶ 113; CWA 56.1 ¶ 37; Pl.'s Resp. CWA 56.1 ¶ 37.) On or about June 23, 2022, Kelly appealed Shelton's denial of his third appeal. (7/1/22 Letter, Chapoteau Decl. Ex. T, ECF No. 90-20; Verizon 56.1 ¶ 115; Pl.'s Resp. Verizon 56.1 ¶ 115; CWA 56.1 ¶ 38; Pl.'s Resp. CWA 56.1 ¶ 38.) On August 15, 2022, the Union Executive Board denied Plaintiff's fourth appeal, upheld Shelton's decision, and notified Kelly he "exhausted [his] internal appeals." (8/15/22 Denial Letter, Chapoteau Decl. Ex. V, ECF No. 90-22; Verizon 56.1 ¶ 116; Pl.'s Resp. Verizon 56.1 ¶ 116; CWA 56.1 ¶ 39; Pl.'s Resp. CWA 56.1 ¶ 39; *see also* Arb. Appeal, Chapoteau Decl. Ex. U, ECF No. 90-21.)

## PROCEDURAL HISTORY

On January 10, 2023, Plaintiff filed the Complaint in this action against the Union and Verizon alleging breach of the CBA by Verizon; a violation of § 8(b) of the National Labor Relations

7

Act (the "NLRA"), 29 U.S.C. § 158(b), by the Union; and breach of the duty of fair representation by the Union. (Compl., ECF No. 6, ¶¶ 45-64.) Following the filing of motions to dismiss by the Union and Verizon, Plaintiff decided to file an Amended Complaint, thereby rendering the motions moot. (*See* 4/19/23 Order, ECF No. 21.) The Amended Complaint, which was filed on April 21, 2023, alleged the same claims against the Union and Verizon. (Am. Compl., ECF No. 22, ¶¶ 55-74.)

The Union and Verizon then filed motions to dismiss the Amended Complaint. (CWA 5/26/23 Not. of Mot., ECF No. 27; Verizon 5/26/23 Not. of Mot., ECF No. 24.) In a Report and Recommendation, dated July 25, 2023 ("7/25/23 R&R"), the undersigned construed the claims against the Union and Verizon as asserting a "hybrid" claim under Section 301 of the Labor Management Relations Act ("LMRA")[6] and breach of duty of fair representation under the NLRA[7]—referred to in the R&R as "a hybrid § 301/duty of fair representation claim"—and recommended that the motions to dismiss be denied. *See Kelly v. Commc'ns Workers of Am., AFL-CIO*, No. 22-CV-10923 (GHW) (SDA), 2023 WL 5105482, at *3 (S.D.N.Y. July 25, 2023). On August 9, 2023, the 7/25/23 R&R was adopted by District Judge Woods. *See Kelly v. Commc'ns Workers of Am., AFL-CIO*, No. 22-CV-10923 (GHW), 2023 WL 5108756, at *1 (S.D.N.Y. Aug. 9, 2023).

By Opinion and Order, dated October 11, 2023, Plaintiff was given leave to file an amended pleading to add a claim against Verizon under the New York State Human Rights Law

---

[6] Section 301 of the LMRA provides a remedy for "violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(c).

[7] "The 'duty of fair representation is implied from § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a).'" *Arnold v. 1199 SEIU*, No. 09-CV-05576 (DLC), 2009 WL 4823906, at *3 (S.D.N.Y. Dec. 15, 2009), *aff'd*, 420 F. App'x 48 (2d Cir. 2011) (quoting *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 179 n.3 (2d Cir. 2001)).

("NYSHRL"). *See Kelly v. Commc'ns Workers of Am., AFL-CIO*, 697 F. Supp. 3d 193, 196, (S.D.N.Y. 2023). On October 12, 2023, Plaintiff filed the Second Amended Complaint ("SAC"), which is the operative pleading in this case. (SAC, ECF No. 47.)

Following the completion of discovery, Plaintiff filed his partial motion for summary judgment on February 16, 2025, and the Union and Verizon filed their motions for summary judgment on February 18, 2025. (*See* Pl.'s 2/16/25 Not. of Mot.; CWA 2/18/25 Not. of Mot.; Verizon 2/18/25 Not. of Mot.)

## SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321-23 (1986). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). A dispute concerning a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether genuine issues of fact exist, "the court must review the record taken as a whole." *Moll v. Telesector Res. Grp., Inc.,* 94 F.4th 218, 227 (2d Cir. 2024) (cleaned up).

Moreover, the Court must "view the evidence in the light most favorable to the non-moving party . . . and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations omitted); *see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004)

(in deciding Rule 56 motion, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." (citation omitted)). "Indeed, in ruling on a motion for summary judgment, the court must disregard all evidence favorable to the moving party that the jury is not required to believe." *Moll*, 94 F.4th at 227-28. Nonetheless, summary judgment is proper when the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 228 (citation omitted).

The same standards apply to cross-motions for summary judgment. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *see also ExteNet Sys., Inc. v. Village of Pelham*, 377 F. Supp. 3d 217, 223 (S.D.N.Y. 2019). "When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences in favor of the non-moving party." *Doe Fund, Inc. v. Berkley Ins. Co.*, 725 F. Supp. 3d 443, 446 (S.D.N.Y. 2024) (citing *Schwebel v. Crandall*, 967 F.3d 96, 102 (2d Cir. 2020)). "But where . . . the cross-motion seek a determination of the same issues, the Court can consider them together." *Jofaz Transp. Inc. v. Local 854 Pension Fund*, No. 22-CV-03455 (CS), 2024 WL 1827319, at *6 (S.D.N.Y. Apr. 26, 2024) (cleaned up).

## DISCUSSION

Plaintiff's SAC contains four counts. First, Plaintiff alleges that Verizon breached the CBA by terminating his employment without cause. (SAC ¶¶ 58-65 (First Count).) Second, Plaintiff alleges that the Union unlawfully discriminated against him with respect to the terms and conditions of his employment in violation of the NLRA. (SAC ¶¶ 66-71 (Second Count).) Third,

Plaintiff alleges that the Union breached its duty of fair representation owed to him. (SAC ¶¶ 72-77 (Third Count).) Fourth, Plaintiff alleges that Verizon discriminated against him based upon his race in violation of the NYSHRL. (SAC ¶¶ 78-81 (Fourth Count).) As was done in the 7/18/23 R&R, the undersigned construes the first three Counts as a hybrid § 301/duty of fair representation claim against Verizon and the Union,[8] and will address that claim first. Second, the Court will address the NYSHRL claim against Verizon.

## I.    Hybrid § 301/Duty Of Fair Representation Claim

### A.    Legal Standards

In a hybrid § 301/duty of fair representation claim, the plaintiff can choose to name both the employer and the union as defendants, or only one of the two. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 165 (1983). Regardless of who is named a defendant, the plaintiff must make three showings. First, the plaintiff must prove that the employer in fact breached the CBA. *White*, 237 F.3d at 178. Second, the plaintiff must show that the Union breached its duty of fair representation. *Id.* Finally, the plaintiff must show that there is a causal connection between the Union's wrongful conduct and any injuries that he suffered. *Spellacy v. Airline Pilots Assoc.-Intl.*, 156 F.3d 120, 126 (2d Cir. 1998).

In interpreting the CBA, the court must be guided by traditional contract rules of interpretation, so long as those rules are consistent with federal labor policy. *Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.*, 230 F.3d 569, 576 (2d Cir. 2000). Unambiguous terms must

---

[8] *See Yearwood v. New York Presbyterian Hosp.*, No. 12-CV-06985 (PKC), 2013 WL 4713793, at *2 (S.D.N.Y. Aug. 20, 2013) ("Although plaintiff pleads separate counts against the Union and the Hospital under the NLRA and the LMRA, respectively, these allegations together constitute a 'hybrid' claim under Section 301 of the LMRA and the Union's duty of fair representation under the NLRA.").

be given effect as written, but when terms are ambiguous, the court may examine extrinsic evidence. *Id.* Additionally, when terms of a contract are ambiguous, the meaning of the contract may become an issue of fact. *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006).

"'[A] union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith.'" *Sanozky v. Int'l Ass'n of Machinists & Aerospace Workers*, 415 F.3d 279, 281 (2d Cir. 2005) (quoting *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998)). "This duty applies to a union's representation of an employee during the grievance process following an employee's termination." *Arnold*, 2009 WL 4823906, at *3 (citing *Wilder v. GL Bus Lines*, 258 F.3d 126, 129 (2d Cir. 2001)).

"'[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational.'" *Sanozky,* 415 F.3d at 282-83 (quoting *Airline Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). "A union acts discriminatorily where 'substantial evidence' indicates that it engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'" *Garnes v. Pritchard Indus., Inc.*, No. 20-CV-03843 (PAE) (SLC), 2023 WL 3980693, at *13 (S.D.N.Y. May 23, 2023), *report and recommendation adopted*, 2023 WL 3977882 (S.D.N.Y. June 13, 2023) (quoting *Vaughn v. Airline Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010)). "A union acts in bad faith only if [it] acts fraudulently, deceitfully, or dishonestly." *Id.* (citing *White*, 237 F.3d at 179).

"Judicial review of union action . . . must be highly deferential, recognizing the wide latitude that unions need for the effective performance of their bargaining responsibilities." *Spellacy*, 156 F.3d at 126 (cleaned up). "Although 'a union may not arbitrarily ignore a meritorious

grievance or process it in perfunctory fashion,' members 'do not have an absolute right to have their grievances taken to arbitration.'" *Arnold*, 2009 WL 4823906, at *3 (quoting *Spellacy,* 156 F.3d at 128 (2d Cir. 1998)). "[T]he duty of fair representation is not breached where the union fails to process a meritless grievance," *id*. (quoting *Cruz v. Local Union No. 3 of Int'l. Bhd. of Elec. Workers,* 34 F.3d 1148, 1153-54 (2d Cir. 1994)), "because 'a union must be allowed to exercise reasonable discretion as to how it can best satisfy the interests of the individual as well as the interests of the collective unit.'" *Id*. (quoting *Pyzynski v. N.Y. Cent. Ry. Co.,* 421 F.2d 854, 864 (2d Cir. 1970)). "Establishing that the union's actions were sufficiently arbitrary, discriminatory or in bad faith, is only the first step toward proving a fair representation claim." *Spellacy*, 156 F.3d at 126 (internal quotations omitted). A plaintiff also must demonstrate a causal connection between the union's wrongful conduct and his injury. *See id.*

> **B.    Application**

The Court first considers whether Plaintiff can show that the Union breached its duty of fair representation. *See Young v. U.S. Postal Serv.*, 907 F.2d 305, 307 (2d Cir. 1990) (proof of union's breach prerequisite to considering merits of claim against employer). Plaintiff contends that he is entitled to summary judgment because the Union breached it duty of fair representation by deciding not to arbitrate his termination in an arbitrary manner and due to discriminatory reasons. (Pl.'s Mem., ECF No. 85, at 10-13; *see also* Pl.'s Opp. Mem., ECF No. 111, at 12-17.) Defendants contend that they are entitled to summary judgment because the evidence shows that no reasonable jury could find that CWA violated its duty of fair representation by deciding not to arbitrate Verizon's discharge of Plaintiff. (CWA Mem., ECF No. 96, at 1; Verizon Mem., ECF No. 93, at 21-24.)

### 1.  __Discriminatory Reasons__

First, Plaintiff contends that the Union's decision to forego arbitration was not based on the view that his grievance lacked merit, but was based on his race because the Union was concerned about defending a "racist." (Pl.'s Mem. at 11.) Plaintiff cites to testimony from Trainor, who Plaintiff contends was the principal decision maker, that part of his decision was based on the fact that Union members and staff members disapproved of the Union "taking cases of people using the N word" because "they found it offensive and felt [the Union was] protecting racists." (*Id*. at 11-12 (citing, *inter alia*, Trainor Dep. Tr., Stark Decl. Ex. E, ECF No. 86-5, at 103, 144).) Plaintiff contends that "[t]he Union cannot legitimately explain the decision not to arbitrate [his] termination without pointing to this anticipated, race-based reaction of Union staffers." (Pl.'s Mem. at 12.) Plaintiff's argument appears to be that consideration of the views of members and staff was discriminatory because those views were based on Plaintiff's race. (*See* Pl.'s Reply, ECF No. 130, at 2.) However, Trainor testified that both people of color and white staff would have a problem with the Union taking the case to arbitration of anyone who used the n-word, not just a white man. (Trainor Dep. Tr., Stark Decl. Ex. E, at 149.) Trainor also testified that part of the "problem [he had]" was that taking this type of case to arbitration annoyed staff and members when the Union had "no way of winning" and "[i]f [he] believed [he could] win [Kelly's] case, he would explain to [members] just like [he] did [when he previously took a similar case to arbitration.]" (*Id*. at 147, 148, 175.) Thus, Trainor's testimony does not support Plaintiff's

contention that the Union's decision not to arbitrate was based on his race, but rather the Union's determination that it could not win at arbitration.[9]

Moreover, following Trainor's decision, Kelly appealed to Shelton who determined that "[t]he fact that [Kelly] clearly used a racial slur, as evidenced by [Kelly's] account of that day and the recording of [his] conversation, present[ed] a substantial and likely insurmountable hurdle to CWA's success in arbitration." (CWA Mem. at 13 (citing Shelton Decl., ECF No. 102, ¶ 9.) Shelton's decision was affirmed by the CWA Executive Board. (Verizon 56.1 ¶ 116; Pl.'s Resp. Verizon 56.1 ¶ 116.) Plaintiff has not presented any evidence that Shelton or the Executive Board acted with discriminatory intent or improper motive.[10] (*See* CWA Mem. at 6.) Accordingly, the Court finds that Plaintiff has adduced no evidence from which a reasonable factfinder could conclude that the Union's decision to forego arbitration was discriminatory.

---

[9] Other evidence in the record also indicates that Trainor, in particular, went out of his way to attempt to help Plaintiff. (*See, e.g.,* Kelly-Trainor Text Messages, Trainor Decl. Ex. A, ECF No. 103-1, at PDF p. 33 ("So you know I tell the company as often as I can how much this case means to me. . . . It is how to get around the zero [t]olerance issue that is causing all the delay."); Trainor Dep. Tr., Stark Decl. Ex. E, at 173 (Q. Why did you [spend so much time reviewing Kelly's appeal]? . . . A. Because I believed in him. Q. You told me you had already made the decision months and months before that you weren't going to arbitrate his case, right? A. Right. I also told you I was looking for a loophole, any loophole I could find that may be able to take his case to arbitration or to find a manager that would listen to my begging to try to get his job back.").)

[10] In his reply memorandum, Plaintiff argues that Trainor influenced Shelton and was a member of the Executive Board and, thus, they acted as conduits for Trainor's discrimination. (Pl.'s Reply at 4.) However, as set forth above, Trainor's testimony does not support Plaintiff's contention that Trainor's denial of Plaintiff's grievance was based on his race. In any event, the testimony cited by Plaintiff that Trainor discussed Kelly's grievance with Shelton and the fact that Trainor was on the Executive Board do not suggest that Trainor improperly influenced Shelton or the Board. Trainor testimony regarding his conversation with Shelton referred to whether the Union could win the arbitration. (Trainor Dep. Tr., Young Decl. Ex. K, ECF No. 98-10, at 19-20.)

2.     **Arbitrary Conduct**

Plaintiff also argues that the Union's decision was arbitrary because its "purported belief that Verizon had a zero-tolerance policy which mandated the termination of any employee who used an n-word" was "a fantasy" belied by the language in the Code of Conduct and the more favorable treatment by Verizon of two African American employees, Carlton Evans and Ronald Williams. (Pl.'s Mem. at 12-13.) The Union argues that it reasonably concluded that an arbitrator would confirm that Verizon had a zero-tolerance policy for racial slurs in the workplace based, in part, on the fact that the Union had lost other arbitrations attempting to challenge application of the policy in similar circumstances. (CWA Opp. Mem., ECF No. 125, at 8-9.)

"[T]he duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." *Garnes*, 2023 WL 3980693, at *14. The "wide range of reasonableness gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Torres v. Int'l Bhd. of Teamsters*, No. 13-CV-05352 (RMB), 2015 WL 774679, at *5 (S.D.N.Y. Feb. 20, 2015); *see also Jourdain v. Serv. Emps. Int'l. Union Local 1199,* No. 09-CV-01942 (AKH), 2010 WL 3069965, at *4 (S.D.N.Y. July 28, 2010) ("[A] union has satisfied its duty of fair representation when it has investigated a member's claim and reasonably determined that it is either meritless or unlikely to succeed.").

The Court agrees with Defendants that Plaintiff has not offered facts demonstrating that the Union's decision to forego arbitration on his behalf was irrational. The record shows that the Union was aware of the facts emphasized by Plaintiff, including that he was on his lunch break and did not know a Verizon employee was listening to his call, and nonetheless determined that

arbitration would not be successful because Plaintiff admitted to using a racial slur, the comment was recorded, and it was overheard by a co-worker during that employee's workday.[11] (*See* 10/18/21 Denial Letter; 4/7/22 Denial Letter; 6/1/22 Denial Letter.) Based on those facts, the Union determined that it could not win at arbitration. (*See id.*) Even if the Union "misjudged the merits" of Plaintiff's grievance, that is not enough for a reasonable factfinder to conclude that the Union's decision was arbitrary, irrational or in bad faith. *See Torres*, 2015 WL 774679, at *6 (citing, *inter alia*, *Carrion v. Local 32B–32J Serv. Emps. Int'l. Union*, No. 03-CV-01896, 2005 WL 659321, at *9 (S.D.N.Y. Mar. 21, 2005) ("even if reasonable people could disagree about the Union's decision to forego arbitration, it was not so far outside a wide range reasonableness as to be arbitrary, irrational, or subject to a claim of bad faith" (internal quotation marks omitted)).

In support of its decision not to arbitrate, the Union also points out that it did arbitrate, and won, a case on behalf of another white employee, Thomas Dejulio, because Verizon could not prove that he used a racial slur. (CWA Mem. at 19-20; CWA Opp. Mem. at 11; *see also* Kelly-Trainor Text Messages, at PDF p. 45-48.) In contrast, here, Kelly admitted to using the n-word

---

[11] Kelly suggests that Trainor claimed "not to know, or care" that Kelly was on his lunch break at the time of the incident and, thus, "never bothered to conduct a minimal investigation of the facts before declining to arbitrate the termination of Mr. Kelly's employment." (Pl.'s Reply at 6-7.) Trainor testified that he thought Kelly told the Union Kelly was on his lunch break, but did not verify whether Kelly was on his lunch break because it didn't determine whether he should take the case to arbitration. (Trainor Dep. Tr. at 51-53.) The written record of Kelly's appeals and subsequent denials belies any suggestion that the Union was unaware, or did not consider, the fact that he was on his lunch break at the time of the incident. Kelly repeatedly raised this point in appealing the denial of his grievance and Gallagher and Trainor both acknowledged it in their denial letters, but determined that it did not change Verizon's zero-tolerance policy. (*See* 10/18/21 Denial Letter at 1 ("Although you mention that you were on your lunch hour and having a private conversation, the other employee was not on their lunch hour. The other employee was subjected to this language during their work schedule which is covered by the Code of Conduct."); 4/7/22 Denial Letter at 2 (noting facts set forth by Kelly, including that he was on his lunch break, and stating "Even assuming that the racial slur was not directed at the dispatcher or intended to harm anyone, as a Verizon employee, you are expected to at in accordance with the Code of Conduct at all times regardless of whether you are on paid work time or not.").)

ending in an "a"[12] and there was a recording of the call. (Verizon 56.1 ¶¶ 65, 68; Pl.'s Resp. Verizon 56.1 ¶¶ 65, 68; *see also* CWA 56.1 ¶¶ 10-11; Pl.'s Resp. CWA 56.1 ¶¶ 10-11.) The Union further cites evidence that "[i]n the past decade, CWA has lost every such case where the grievant admitted to using the racial slur." (CWA Mem. at 18-20; CWA Opp. Mem. at 8-10; Albee Award, Young Decl. Ex. U, ECF No. 98-20; Pakhladzhyan Award, Young Decl. Ex. T, ECF No. 98-19.)

With respect to Williams and Evans, even if the Union had been aware of these incidents at the time it made the decision to forgo arbitration in Kelly's case,[13] these incidents do not render its determination that it could not succeed at arbitration so far outside of a range of reasonableness as to be irrational. Plaintiff's argument that his case is analogous to that of Williams because both men were off Verizon time and property (*see* Pl.'s Reply at 8) is misplaced because there is no evidence that Verizon reached its decision on that basis. Rather, Verizon determined that Williams violated the Code of Conduct but did not discipline him because of its determination that doing so would violate the National Labor Relations Act. (Rocco Decl. ¶¶ 44-46.) Thus, his case does not suggest that Verizon did not have a zero-tolerance policy or render the Union's decision not to arbitrate Kelly's case irrational. With respect to Evans, the Union

---

[12] In denying Kelly's third appeal, the Union determined that this distinction was not a basis to pursue his claim. (*See, e.g.*, 6/1/22 Denial Letter at 2 ("Regardless of how you may feel about the use of the racial slur, and regardless whether you felt it was your right to utter such a slur given some asserted nuance in your pronunciation that you believe clears you of any wrongdoing, your actions led directly to a fellow CWA member being subjected to language she very reasonably perceived as highly offensive. I do not believe that an arbitrator would accept the argument that your colleague was not subjected to offensive language due to your pronunciation of the last letter of a particularly odious racial slur or your intent behind using it.").)

[13] The Union asserts that the Williams incident occurred on June 2, 2022, one day after Shelton denied Kelly's third appeal, and Plaintiff did not raise it with the Executive Board, and, therefore, the Union could not have argued to Verizon that Plaintiff was treated differently as compared to Williams. (CWA Opp. Mem. at 6-7.) Kelly responds that the Executive Board did not render its decision until August 15, 2022, but does not dispute that he did not raise the Williams case with the Board. (Pl.'s Reply at 8.)

submitted evidence that it could not corroborate that Evans used a racial slur (Francis Decl., ECF No. 121, ¶¶ 10-14) and, thus, this case also does not suggest that Verizon did not actually have a zero-tolerance policy or render the Union's determination irrational.

In sum, Plaintiff has not offered facts demonstrating that the Union's decision not to pursue arbitration on his behalf was irrational or discriminatory. Thus, the Court finds that there is no genuine issue of material fact with respect to the duty of fair representation. *See Soto v. ECC Indus., Inc.*, 358 F. App'x 220, 222 (2d Cir. 2009) (concluding, as matter of law, that record did "not permit a reasonable finding that the Union's decision not to pursue [the plaintiff's] grievance was irrational"); *Pinkney v. Progressive Home Health Serv.'s,* 367 F. App'x 210, 212 (2d Cir. 2010) (affirming district court's award of summary judgment, noting that "[n]othing in the record suggests that this decision was 'so far outside a wide range of reasonableness as to be irrational'" (citation omitted)). Accordingly, Plaintiff cannot prevail on his hybrid § 301/fair representation claim. *See Torres*, 2015 WL 774679, at *7 (citing *White v. White Rose Food*, 237 F.3d 174, 183 (2d Cir. 2001) ("[P]laintiffs' failure to establish their [duty of fair representation] claim against the union means that their hybrid § 301/DFR claim against [their employer] necessarily fails as well.")). For these reasons, it is recommended that Plaintiff's partial motion for summary judgment on his hybrid § 301/fair representation claim be denied and Defendants' motion as to that claim be granted.

**II.**   **NYSHRL Claim**

   **A.**   **Legal Standards**

As Verizon acknowledges in its moving memorandum, because Plaintiff's claims accrued after August 12, 2019, the standard of liability under the NYSHRL is "treated as akin to the

standard under the [New York City Human Rights Law]."[14] (Verizon Mem. at 9 n.5 (quoting *Times v. Success Acad. Charter Sch., Inc.*, No. 23-CV-03229 (DLC), 2024 WL 5009166, at *12 (S.D.N.Y. Dec. 6, 2024).) "A court must construe all provisions of the NYCHRL broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Perez v. Y & M Transp. Corp.*, 219 A.D.3d 1449, 1451 (2d Dep't 2023) (internal quotation marks and citation omitted). "Courts . . . should construe the NYCHRL 'liberally for the accomplishment of the uniquely broad and remedial purposes thereof.'" *Bueno v. Eurostars Hotel Co., S.L.*, No. 21-CV-00535 (JGK), 2022 WL 95026, at *8 (S.D.N.Y. Jan 10, 2022) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).

"Under the NYCHRL, at summary judgment, the 'defendant bears the burden of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under any of the evidentiary routes: under the *McDonnell Douglas* test, or as one of a number of mixed motives, by direct or circumstantial evidence.'" *Parker v. Israel Disc. Bank of New York, Inc.*, No. 24-688-CV, 2025 WL 1779219, at *3 (2d Cir. June 27, 2025) (quoting *Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29, 41 (1st Dep't 2011)).[15] "A plaintiff can defeat summary judgment merely by producing some evidence to

---

[14] *See also Obah v. Dep't of Admin. for Children's Servs.*, No. 23-CV-04997 (GHW) (SDA), 2024 WL 2848903, at *9 (S.D.N.Y. May 2, 2024) ("Courts in this District have interpreted the amendment [to the NYSHRL] as 'rendering the standard for claims closer to the standard of the NYCHRL[.]'" (citing cases)), *report and recommendation adopted*, 2024 WL 2848883 (S.D.N.Y. May 30, 2024); *Jones-Cruz v. Brookdale Hosp. Med. Ctr.*, No. 19-CV-06910 (MMG), 2025 WL 1617193, at *7 n.6 (S.D.N.Y. June 6, 2025) ("[B]ecause the alleged conduct at issue began in 2020 following the August 12, 2019 effective date of [the NYSHRL] amendment, the NYCHRL's more liberal framework applies.") (citing cases).

[15] In *Parker*, the Second Circuit did not apply this standard to the NYSHRL claim, which accrued in early 2019, prior to the amendment. *See Parker*, 2025 WL 1779219, at *1; *see also Parker v. Israel Disc. Bank of New York, Inc.*, No. 21-CV-07196 (VEC), 2024 WL 455220, at *10 (S.D.N.Y. Feb. 6, 2024) (stating plaintiff's claims accrued in "early 2019").

suggest that *at least one reason* is false, misleading, or incomplete." *Id.* (emphasis in original) (cleaned up). Nevertheless, under the NYCHRL, "[s]ummary judgment is appropriate if 'the record establishes as a matter of law' that discrimination or retaliation 'play[ed] no role' in the defendant's actions.'" *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015) (quoting *Mihalik*, 715 F.3d at 110 n. 8)); *see also Jones-Cruz*, 2025 WL 1617193, at *7 n.6 (noting same standard applies to NYSHRL claim).

    **B.**    **Application**

Plaintiff alleges that race was a motivating factor in Verizon's decision to terminate his employment, in violation of the NYSHRL, because Verizon tolerated similar conduct by non-Caucasian employees and unequally applied its Code of Conduct based on race. (SAC ¶¶ 34-36, 45-47, 79.) In moving for summary judgment, Verizon argues that there is no evidence that Plaintiff was treated less well because of his race. (Verizon Mem. at 8-19.)

Verizon contends that it treats all employees the same regardless of race and that Plaintiff has failed to identify a similarly situated employee outside of his protected class who was treated better under similar circumstances. (Verizon Mem. at 12-16.) Verizon cites evidence from its Senior Director of Human Resources that she has not seen exceptions to Verizon's zero-tolerance rule (*see id.* at 15-16 (citing Verizon 56.1 ¶ 39)), and a declaration from its Senior Manager of Employee Relations regarding eight employees, some of whom identified as Caucasian and some of whom identified as African American, whose employment Verizon also terminated after determining that they used language in violation of Verizon's zero-tolerance anti-discrimination and anti-harassment policy. (Verizon 56.1 ¶ 121 (citing Rocco Decl. ¶ 41).)

21

In opposition to Verizon's motion, Plaintiff argues that he has provided evidence that his termination occurred under circumstances of discriminatory intent. (Pl.'s Opp. Mem. at 22-26.) "A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (cleaned up). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Id.* at 493-94. Verizon argues that Plaintiff cannot establish an inference of discrimination based upon the fact that Williams was not terminated because Williams was engaged in protected activity and, therefore, not similarly situated to Plaintiff. (Verizon Mem. at 13-15; Verizon Reply at 7-10.) However, Verizon does not dispute that Williams was subject to the same Code of Conduct and engaged in comparable conduct, and the Court is mindful that that "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *King v. Aramark Servs. Inc.*, 96 F.4th 546, 563 (2d Cir. 2024) (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). Thus, viewing the evidence in the light most favorable to Plaintiff, there is some evidence from which a reasonable jury could infer discriminatory intent.

Verizon further argues that, even if Plaintiff can establish a *prima facie* case of discrimination, it has provided a legitimate, non-discriminatory reason for his termination, namely that it terminated Plaintiff because it is undisputed that he "violated the Code of Conduct by using the 'full n-word' and subjecting a colleague to offensive language." (Verizon Mem. at 16 (citing Verizon 56.1 ¶¶79-91).) Plaintiff argues that Verizon's reason for its decision is pretextual

because the Code of Conduct did not require his termination, Verizon's investigation was "saturated with race" and the disparate treatment of Evans and Williams show that race motivated Verizon's decision to terminate him. (Pl.'s Opp. Mem. at 27-28; *see also* Pl.'s Resp. Verizon 56.1 ¶¶ 119-21.) Plaintiff also points to additional evidence of disparate treatment in the form of sworn declarations from individuals who worked as Field Technicians who state that they observed African American employees use the n-word or the word "nigga" in the presence of supervisors and those employees were not disciplined in any way. (*See* McArdle Decl., ECF No. 113, ¶ 6; Sheridan Decl., ECF No. 114, ¶ 3; Tornatore Decl., ECF No. 115, ¶ 3; Rodriguez Decl., ECF No. 116, ¶ 5.) Contrary to Verizon's assertion (Verizon Reply at 10-11), the Court finds that these declarations are based on personal knowledge and comply with Federal Rule of Civil Procedure 56(c).[16] Although it is a close call, the Court finds that, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Verizon's zero tolerance policy was applied differently based on race and that race played some role in Plaintiff's termination. *See E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 838 (S.D.N.Y. 2013) )"[I]t is clear that a preference exists under the NYCHRL for a jury to make determinations regarding what are often borderline situations."). Accordingly, Verizon's motion for summary judgment seeking to dismiss Plaintiff's NYSHRL claim should be denied.[17]

---

[16] Rule 56 permits the use of an affidavit or declaration "to support or oppose a motion" for summary judgment if the affidavit or declaration is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

[17] In the alternative, if the Court adopts the recommendation to grant summary judgment to Defendants with respect to the federal claim, the Court may decline to exercise supplemental jurisdiction over Plaintiff's state law NYSHRL claim. *See Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 123 (2d Cir. 2023) ("It is undisputed that, as a general matter, 'after properly granting summary judgment on the [federal]

**CONCLUSION**

For the foregoing reasons, it is respectfully recommended that Plaintiff's motion for summary judgment be DENIED, the Union's motion be GRANTED and Verizon's motion be GRANTED IN PART and DENIED IN PART.

Dated:      New York, New York
            July 11, 2025

_____
**STEWART D. AARON**
**United States Magistrate Judge**

\*              \*              \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Clarke.

---

claims, the District Court had discretion not to exercise supplemental jurisdiction' over any remaining state law claims.") (quoting *Boyd v. J.E. Robert Co.*, 765 F.3d 123, 126 (2d Cir. 2014)).

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).