**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

PETER KELLY,

                                                                   22-cv-10923 (JGLC)(SDA)

                    Plaintiff,

      -against-

COMMUNICATIONS WORKERS OF AMERICA,
AFL-CIO and VERIZON NEW YORK INC.,

                    Defendants.

-------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**VERIZON NEW YORK INC.'S OBJECTION TO MAGISTRATE**
**JUDGE AARON'S REPORT AND RECOMMENDATION**

**COREY STARK PLLC**
110 EAST 59TH STREET, 22ND FLOOR
NEW YORK, NEW YORK 10022

## **TABLE OF CONTENTS**

**Page**

Authorities Cited ................................................................................................................................ ii

Preliminary Statement ........................................................................................................................ 1

Facts ................................................................................................................................................... 2

Argument ............................................................................................................................................ 4

    I.      Standard of Review ............................................................................................................. 4

    II.     Plaintiff's Comparators Are Similarly Situated .................................................................. 5

          a.      Verizon Mistakenly Conflates the R&R Determination That the Union Did Not Act Irrationally with Its Determination That Plaintiff's Comparators Were Not Similarly Situated ........................................................ 5

          b.      Verizon Tacitly Admits by Omission That Plaintiff and Mr. Williams Were Similarly Situated ..................................................................................... 7

          c.      The R&R Does Not Concede That Plaintiff and Carlton Evans Were Not Similarly Situated ................................................................................................. 8

    III.    There is Ample Additional and Admissible Evidence of Discrimination ......................... 9

          a.      The Investigation Report is Saturated by Race ............................................... 9

          b.      The Witness Statements Are Also Admissible Evidence of Discrimination ................................................................................................... 10

          c.      Tolerating the Slurs Described in the Declarations Is Evidence of Discrimination ................................................................................................... 12

Conclusion ........................................................................................................................................ 12

# AUTHORITIES CITED

**Cases**

*DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333 (S.D.N.Y. 2009) .................................................. 5

*Mandell v. County of Suffolk*, 316 F.3d 368 (2d Cir. 2003) ............................................................ 12

*Owusu v. New York State Ins.*, 655 F. Supp. 2d 308 (S.D.N.Y. 2009) ................................... 1, 5, 8

*Ruiz v. County of Rockland*, 609 F.3d 486 (2d Cir. 2010). .............................................................. 9

*Sassaman v. Gamache*, 566 F.3d 307 (2d Cir. 2009). .................................................................... 12

*Schwapp v. Town of Avon*, 118 F.3d 106 (2d Cir. 1997) ................................................................ 10

*Snell v. Suffolk County*, 782 F.2d 1094 (2d Cir. 1986) ................................................................... 12

*United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006) ..................................................................... 5

**Rules**

Fed. R. Civ. P. 72 ............................................................................................................................. 4, 5

Fed. R. Civ. P. 56 ............................................................................................................................... 10

**Statutes**

28 U.S.C. § 636 ................................................................................................................................ 4, 5

## **Preliminary Statement**

The Objections to Magistrate Judge Stewart Aaron's Report and Recommendation (the "R&R") of Verizon New York, Inc. ("Verizon") are the latter's latest attempt to obtain dismissal of Plaintiff's NYSHRL Claim without going to the trouble of trying significant, genuine issues of material fact. All the issues raised by Verizon were already thoughtfully considered by the Magistrate Judge. Most saliently, Verizon completely mischaracterizes the R&R by attributing to it a finding that Plaintiff's Verizon comparators were not similarly situated. The report correctly recognizes not only that the question whether two employees are similarly situated ordinarily presents a question of fact for the jury, but also that Verizon never disputed Plaintiff's contention that he and his comparators were subject to the same workplace rules and had engaged in comparable conduct – which is the analysis one must apply in determining whether employees are similarly situated.

Verizon's Objections also revive the company's same tired arguments dismissing the sworn declarations of employees who, like Plaintiff, worked as field technicians and whose testimony confirms Plaintiff's core contention that Verizon has long applied rules differently based on an employee's race. Verizon's repetitive exercise constitutes exactly the kind of "merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers" which this Court warned about in *Owusu v. New York State Ins.*, 655 F. Supp. 2d 308, 313 (S.D.N.Y. 2009).

As set forth below, the Court should adopt the R&R and allow this matter to proceed to trial.

## **Facts**

Plaintiff is a Caucasian male who began working for Verizon on February 21, 2000, as a field technician. (R&R, pp. 1-2.) Plaintiff was an excellent employee for twenty-one years and was never disciplined for any reason. (ECF No. 86-5, p. 80:7-15 and ECF No. 86-6.)

On April 6, 2021, Plaintiff was assigned to the 7:00 a.m.-to-4:30 p.m. shift. While on lunch break, and not on Verizon property, Plaintiff took a personal call on his private cellular phone. (ECF No. 86-2, p. 30:13-18; ECF No. 86-8 p. 2.) Plaintiff and his interlocutor friend discussed the news that the rapper DMX had been hospitalized. They mentioned the fact that DMX often used the word "nigga" in his song lyrics. (ECF No. 86-2, pp. 87:20-23 and 114:22 – 116:10.) Some joking and mimicking of urban slang ensued. (ECF No. 86-2, pp. 114:22 – 115:5.) Unbeknownst to Plaintiff, at 12:26 p.m. he inadvertently answered his company cellphone. (ECF No. 86-2, pp. 30:13-18 and 112:2-12; ECF No. 86-5, p. 56:6-19, and ECF No. 86-8 pp. 2 and 4.). The Verizon dispatcher on the other end of the line listened in to Plaintiff's private conversation for almost a full minute before announcing herself, during which time she overheard him use the word "nigga" in the context of the conversation described above. (ECF No. 86-8 p. 2.)

On April 23, 2021, Verizon suspended Plaintiff pending an investigation for discrimination and harassment. A subsequent report documented Verizon's findings. It included the following statement of facts: (1) Plaintiff was on lunch break when he received the call from his friend, who was not a Verizon employee; (2) he inadvertently answered the call from a Verizon associate while still on his lunch break; (3) he was unaware that he had answered the Verizon associate's call, and so continued with his personal call; (4) he admitted using the word "nigga"; (5) the Verizon associate listened in for approximately one minute before announcing herself; and (6) the Verizon

associate who listened to the call is African American. (ECF No. 86-8.) On May 10, 2021, Verizon placed Plaintiff on a ten-day suspension pending dismissal. (R&R, p. 5.) The same communication notified Plaintiff that his employment would be terminated effective May 19, 2021, for "just cause," *i.e.*, violating Verizon's code of conduct (the "Code of Conduct").

While Verizon claims to have a zero-tolerance policy for discriminatory behavior, it actually operates under a racial double standard. Verizon permits, and even encourages through inaction, non-Caucasian employees using the same word used by Plaintiff – and worse. (ECF No. 86-2, pp. 134:2-15, 162:7-16, ECF No. 86-12, ECF No. 112-1, pp. 132:20–134:15.) Yet those other employees escape discipline. *Id*. It turns out that many non-Caucasian employees routinely use "nigger" and "nigga" in the workplace, and in the presence of management-level employees, but are not reprimanded or disciplined in any way. *Id*. The *de facto* rule at Verizon: It's okay as long as you're not white, you won't get fired.

In fact if you *are* white, complaining about this double standard will get you fired. A specific example: Rita Morgan, a Caucasian former employee of Verizon, once complained that Carlton Evans, an African American employee, said the word "nigger" frequently in the presence of employees, and loudly enough that customers could hear him. (ECF No. 86-13.) Verizon gave Mr. Evans nothing but a warning. (ECF No. 86, p. 2.) Yet it terminated *Ms. Morgan* for complaining that Mr. Evans did not receive a sufficient punishment -- because she *quoted* the word "nigger" in her complaint(!) (ECF No. 86-13 p. 6.) Perhaps more significant was the case of Ronald Williams, an African American field technician in the New York area, who in 2022 used the word "nigga," five times, while in uniform, on a Verizon ramp, and while talking to numerous Verizon employees. (ECF No. 86-14, pp 3-5.) Verizon's investigation reported that Mr. Williams did indeed use the word "nigger" and thereby violated the Code of Conduct. (ECF No. 86-14, p.

3

7.) Yet Mr. Williams got no discipline and kept his job. Verizon had not disciplined Mr. Williams (because -- in direct contradiction of the known facts -- Verizon decided he was not on Verizon property or Verizon time). (ECF No. 86-14.)

When it comes to the n-word, a double standard prevails at Verizon, one set of rules if you are black, another if you are white. The use of "nigger" and "nigga" by African American employees was and is historically tolerated at Verizon. According to four former field technicians, African American employees regularly, routinely, and freely said "nigger" and "nigga" at the Nepperhan Avenue garage and numerous other Verizon locations. (ECF 112, 113, 114, 115, and 116.) Not only that, but various black *supervisors* do it too. And just like Carlton Evans and Ronald Williams, all escape discipline. *Id*. Verizon supervisors have also tolerated African American employees' use of the words "cracker," "white boy," and "spic." (ECF 113 ¶ 6 and 116 ¶ 5.) These revelations comport with the testimony of Mr. Kelly that during the time he was employed at Verizon black employees said "nigger" and "nigga" daily and often in the presence of supervisors, some with impunity. (ECF 112-1 pp. 132:20–134:15 and 162:2–164:6.)

## Argument

I.   **Standard of Review**

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Parties may raise objections to the magistrate judge's report and recommendation, which must be "specific," "written," and submitted "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed. R. Civ. P. 72(b)(2). A district court conducts a *de novo* review of those portions of the report, or specified proposed findings or

recommendations, to which timely objections are made. 28 U.S.C. § 636(b)(l)(C); *see* Fed. R. Civ. P. 72(b)(3) ("The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions"). However, "objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke *de novo* review [because] [s]uch objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu*, *supra*, 655 F. Supp. 2d 308, 313 (S.D.N.Y. 2009). Clear error is the standard applied when the same arguments are rehashed. "A decision is 'clearly erroneous' when the Court 'upon review of the entire record, [is] left with the definite and firm conviction that a mistake has been committed.'" *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 339–40 (S.D.N.Y. 2009) (quoting *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006)).

The clear-error standard applies to Verizon's reiterated objection to the admissibility of the statements of Messrs. McCardle, Sheridan, Tornatore, and Rodriguez. Verizon contends that Magistrate Judge Aaron erred by ignoring and misapplying the arguments previously included in its motion papers. But the Magistrate didn't ignore or misapply Verizon's arguments. He *disregarded* them, because they lacked merit. The R&R specifically states that these employee statements set forth facts that would be admissible in evidence. (R&R, p. 23, footnote 16.)

## II. Plaintiff's Comparators Are Similarly Situated

### a. Verizon Mistakenly Conflates the R&R Determination That the Union Did Not Act Irrationally with Its Determination That Plaintiff's Comparators Were Not Similarly Situated

Verizon asserts that "the R&R in fact *recognized* in deciding the hybrid § 301/duty of fair representation claim in favor of Defendants (R&R, at pp. 18-19), neither of these employees [Williams and Evans] are similarly situated to Plaintiff." As a result, says Verizon, the Court can

5

dismiss Plaintiff's NYSHRL claim "because the R&R rejected Plaintiff's similarly situated theory as to Mr. Williams merely four pages earlier," at page 18. In fact, the R&R reached no such conclusion. Verizon confuses two separate R&R analyses, borrowing from one what it cannot find in the other.

The discussion Verizon is referring to appears in the section addressing Plaintiff's *duty of fair representation* (DFR) claim, not his discrimination claim. (R&R, p. 18.) And the Magistrate does not say that Plaintiff's comparators were not similarly situated; he makes no determination either way. What he says is that the comparator issue is beside the point for purposes of the DFR claim, since the reasoning of both the Union, in deciding not to take Peter Kelly's case to arbitration, and Verizon's, in not firing Messrs. Williams or Evans for having used the "n" word, had nothing to do with that issue. (R&R, P. 18.) Note the R&R's description of Plaintiff's argument as being "misplaced." Verizon wants the Court to believe that when the R&R says "misplaced" it means "mistaken." That is not what the Magistrate said. Verizon's contention that the R&R rejected Plaintiff's similarly-situated theory distorts the Magistrate's DFR analysis into a discrimination analysis. (R&R, p. 18.) The R&R states conspicuously that the analysis in that section was limited to determining that the incident involving Mr. Williams does not render the Union's determination that it could not succeed at arbitration so far outside of a range of reasonableness as to be irrational -- the standard by which a DFR claim must be analyzed. (*Id.*)

Verizon's misunderstanding -- or stratagem -- rests entirely upon this "Arbitrary Conduct" subsection, which is not where the R&R's discussion of Plaintiff's discrimination claim is to be found. That place, the section entitled "NYSHRL Claim," discusses a completely different standard of review. (R&R, p. 19.) The NYSHRL Claim section requires Verizon to establish that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor,

6

no jury could find Verizon liable for discrimination. (R&R, p. 20.) Bizarrely, at the same time it pretends that the matter has been disposed of by way of the Magistrate's analysis of the DFR issue, Verizon then contradicts itself by "[acknowledging] that whether employees are similarly situated is typically a question for the jury" and conceding that in a separate section "the R&R asserts in connection with the NYSHRL claim that a reasonable jury could find that Mr. Williams is similarly situated to Plaintiff because Mr. Williams was subject to the same Code of Conduct and engaged in comparable conduct." (R&R, at p. 22.) Perhaps Verizon can explain how a reasonable jury might conduct on identical facts a similarly-situated analysis as to one claim but not the other?

Verizon's claim that the R&R rejects Plaintiff's similarly situated theory accordingly misrepresents the R&R and fails on its face. Contrary to Verizon's misrelated interpretation, the R&R rightly concludes that summary judgment against Plaintiff is not appropriate.

### b. Verizon Tacitly Admits by Omission That Plaintiff and Mr. Williams Were Similarly Situated

As noted above, it is in the NYSHRL discussion that R&R does apply the appropriate standard, and in doing so concludes that Plaintiff and Ronald Williams are similarly situated comparators: "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." (R&R, p 22.) There is *no* dispute that Plaintiff and Mr. Williams were both field technicians who were subject to the very same Code of Conduct and that both employees engaged in comparable behavior. According to Verizon's own investigation, Mr. Williams used the word "nigger" five times while in uniform, on a Verizon ramp, and while talking to the "entire garage." (ECF No. 86-14, pp. 3-5.) Plaintiff used the word "nigga" while on his documented lunch break, on a personal

7

call with a friend who was not a Verizon employee, when he was unaware the dispatch center had called, and without directing it to any Verizon Employee.[1] (ECF No. 86-8.)

Significantly, the R&R makes plain that Verizon failed to dispute the core part of this analysis: "Verizon does not dispute that Williams was subject to the same Code of Conduct and engaged in comparable conduct . . ." (R&R, p. 22.) Verizon's failure to dispute the application of the well settled analysis that is regularly used to determine whether comparators are similarly situated is in and of itself an admission that the Objection lacks merit.

### c. The R&R Does Not Concede That Plaintiff and Carlton Evans Were Not Similarly Situated

As with Mr. Williams, the R&R made no determination that Plaintiff and Carlton Evans were not similarly situated. Also as with Mr. Williams, the only conclusion it reaches is that the incident involving Mr. Evans does not render the Union's determination that it could not succeed at arbitration so far outside of a range of reasonableness as to be irrational. (R&R, p. 18.) Again, as set forth above, this analysis appears in the section disposing of Plaintiff's DFR claim, not his discrimination claim, and this DFR determination has no relevance whatsoever to the central issue in Plaintiff's discrimination claim, whether Plaintiff and Mr. Evans were similarly situated.

Verizon's contingency argument is that Plaintiff and Mr. Evans are not similarly situated for reasons set forth in its moving papers. This is a classic perfunctory response that subjects the argument to the clear-error standard. *Owusu*, 655 F. Supp. 2d 308, 313 (S.D.N.Y. 2009). Mr. Evans, an African American employee, said the word "nigger" frequently in the presence of employees, and loudly enough that customers could hear him. (ECF No. 86-13.) Verizon gave

---

[1] Indeed a strong argument can be made, on a number of grounds, that the conduct of Mr. Williams was a more severe violation of the Code of Conduct than Mr. Kelly's: he used the word "nigger" instead of "nigga"; he said it five times; he intentionally said it loudly to the entire garage; he said it for effect; and he initially lied to Verizon about what he had done before ultimately copping to it.

8

Mr. Evans nothing but a warning.  (ECF No. 86-13, p. 2.)  Yet it terminated *another employee* for complaining that Mr. Evans had not received sufficient punishment -- because she *quoted* the word "nigger" in her complaint.

"An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct."  *Ruiz v. County of Rockland*, 609 F.3d 486, 493-494 (2d Cir. 2010) (cleaned up).  The conduct of Mr. Evans was more severe than that of Plaintiff.  Mr. Evans used the word "nigger" numerous times at work and intended for his co-workers to hear him.  The fact that the same discipline standard applied is plain, because Verizon terminated *Rita Morgan* for repeating the word "nigger in her complaint. Thus, the only clear error would be to conclude that Plaintiff and Mr. Evans were not similarly situated.

### III.     There is Ample Additional and Admissible Evidence of Discrimination

#### a.     Verizon's Investigation Report Was Saturated with Race

Substantial additional and admissible evidence of discrimination appears throughout this matter from its earliest moments, evidence Verizon ignores in its Objection to the R&R.  The investigation concerning Mr. Kelly was itself saturated by race. The investigation report highlights the race of the persons involved (ECF No. 86-8, pp. 2 and 4), emphasizing, for starters, the irrelevant fact that the eavesdropping Verizon employee was black.  (ECF No. 86-8, p. 2.)  This fixation on race is again underscored where the report describes *Friday* as a movie "in a comedy series starring *Black* stars Ice Cube and Chris Tucker" [italics added] instead of simple describing these actors as the movie's stars.  (ECF No. 86-8, p. 4.)  Even while insisting that references to the race of those involved should have no relevance to the investigation, Verizon persists in mentioning

9

it. (ECF No. 112-4, pp. 126:8–127:14 and 129:20–130:6.) These repeated, transparent, gratuitous, cynical references speak for themselves. Nobody is fooled.

The Verizon investigation report is incontestably admissible. Verizon says nothing about it now for the simple reason that it can offer no viable argument refuting the obvious inference of discrimination that jumps from its pages.

### b. The Witness Statements Are Also Admissible Evidence of Discrimination

As to the admissibility of the four former employee witness statements, Verizon's reliance on *Schwapp* is misplaced. In *Schwapp,* the Second Circuit held that statements limited to bald assertions and legal conclusions should not be considered. *Schwapp* makes clear that a vague statement like a person "was always making racial slurs about minorities" and bald legal conclusions such as the plaintiff was "working in a hostile or abusive working environment" are insufficient. To the contrary, the declarations of Peter McCardle, Joseph Sheridan, Antony Tornatore, and Ralph Rodriguez are sufficiently particular to satisfy Rule 56(e) of the Federal Rules of Civil Procedure, and thus Magistrate Judge Aaron properly considered these sworn statements.

These are separate, independent statements that together paint a disturbing picture of a permissive atmosphere at odds with Verizon's self-righteous claim that it no tolerance for the use of racial terms. They show a pervasive pattern by Verizon of tolerating racially offensive slurs when uttered by African American employees. The declaration of Ralph Rodriguez states that black field technicians and supervisors who worked with him at the Nepperhan Avenue garage congregated in a room known as the "Black Room" and that during each of his thirteen years at that garage he entered the "Black Room" he heard his fellow field technicians and supervisors use the words "nigga," "nigger," and "spic." (ECF No. 116, ¶ 5.) Verizon assigned Anthony Tornatore

to work at the Nepperhan Avenue garage for thirty-one years, and he regularly and routinely heard African American employees use the words "nigga" and "nigger" in the presence of supervisors. (ECF No.115.) Peter McCardle worked at four separate locations during his thirty-four-year career working at Verizon. (ECF No. 113.) At each of the Verizon locations Mr. McCardle observed African American employees using the words "nigga" and "nigger" in the presence of supervisors. (ECF No. 113, ¶ 6.) Mr. McCardle also witnessed African American employees using the words "cracker" and "white boy" when referring to Caucasians in the presence of supervisors. Id. Joseph Sheridan recounts that during his twenty years working for Verizon he regularly and routinely observed African American employees using words "nigga" and "nigger" at the Nepperhan Avenue garage in the presence of supervisors. (ECF No. 114, ¶ 3.) Mr. Sheridan also describes reporting to the parking lot during the COVID pandemic and hearing black employees using the same words there in the presence of supervisors with impunity. *Id*.

These witness declarations describe the regular and conspicuous use of racial slurs at Verizon and a long history of tolerating the code-violating conduct of certain employees. Unlike in *Schwapp*, these declarations do not make vague or conclusory references to nebulous slurs. They specifically identify the words "nigga," "nigger," "spic," "white boy," and "cracker" with particularity. They also identify where the statements were made. For example. Mr. Rodriguez describes hearing African American field technicians and supervisors using "nigga," "nigger," and "spic" each time he entered the "Black Room" at Nepperhan Avenue garage. (ECF No. 116, ¶ 5.) Mr. Sheridan describes hearing the words in the Nepperhan Avenue garage and regularly in the parking lot during the COVID pandemic. (ECF No. 114, ¶ 3.)

Verizon quarrels with the whether the innumerable incidents were reported to Verizon to allow it to conduct investigations. That is not an issue of specificity, and it is a red herring, for two

11

reasons. First, the witnesses only know that regular and conspicuous use of racial slurs occurred at Verizon and that the people making the statements were not terminated because they continued working. No decision cited by Verizon, or in existence, requires that for a witness's statement to be admissible he must first have reported the conduct he observed. Second, it is the supervisors, not employees such as the declarants here, who are charged with reporting conduct of the sort these witnesses heard and observed. That the conduct instead went unreported does not disqualify, but indeed *establishes conclusively*, the existence of profound disparate treatment of employees based on race.

### c. Tolerating the Slurs Described in the Declarations Is Evidence of Discrimination

On one matter Verizon is correct: that the failure of supervisors to report the repetitive, pervasive, and cavalier behavior described in the four declarations is profoundly significant. An employer has the affirmative duty to prevent employees from being subjected to discrimination in the workplace. *See Snell v. Suffolk County*, 782 F.2d 1094 (2d Cir. 1986). An employer must take effective steps to eliminate discrimination, including slurs about race, and put employees on notice that such behavior will not be tolerated. *Id*. "The failure of an employer to undertake an appropriate response can constitute evidence in support of a Title VII plaintiff's allegations." *Sassaman v. Gamache*, 566 F.3d 307 (2d Cir. 2009). Failing to satisfy this duty, or tolerating invidious comments, leads to the reasonable conclusion that an employer is motivated by discrimination. *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).

## Conclusion

For the reasons set forth above, the Court should adopt the R&R and allow this matter to proceed to trial.

Dated: New York, New York
August 21, 2025

                                        COREY STARK PLLC

                                        /s/_____
By: Corey Stark (CS-3897)
*Attorneys for Plaintiff*
110 East 59th Street, 22nd Floor
New York, New York  10022
(212) 324-3705

13